Ray WELLENS and Olga Wellens,
Plaintiffs and Appellants,

v.

Clarence BECK, Al Georgeson, and Oscar Oakland, individually and/or as partners in any combination doing business as Wellens Auto Supply, Defendants and Respondents.

Martha DENNIS, Plaintiff in Intervention,

v.

Ray WELLENS, Olga Wellens, Clarence Beck, Al Georgeson and Oscar Oakland, individually and/or as partners in any combination, doing business as Wellens Auto Supply, Defendants in Intervention.

M. C. EMERY, Plaintiff in Intervention,

v.

Ray WELLENS; Olga Wellens; Clarence Beck, Al Georgeson and Oscar Oakland, individually and/or as partners in any combination, doing business as Wellens Auto Supply; and Martha Dennis, Intervenor, Defendants in Intervention.

Martha DENNIS, Plaintiff in Intervention,

v.

Ray WELLENS; Olga Wellens; Clarence Beck, Al Georgeson and Oscar Oakland, individually and/or as partners in any combination, doing business as Wellens Auto Supply; and M. C. Emery, Intervenor, Defendants in Intervention.

No. 7665.

Supreme Court of North Dakota.

June 3, 1957.

Rehearing Denied Aug. 27, 1957.

M. W. Duffy, Cooperstown, for appel-. lants.

Cupler, Tenneson, Serkland & Leahy, J. E. Hendrickson, John E. Rilling, Fargo, Woell & Woell, Casselton, George A. Soule, Fargo, for respondents.

JOHNSON, Judge.

This is an action to foreclose a chattel mortgage. The mortgage covered largely automotive parts to be sold by the mortgagors in the course of trade, both wholesale and retail.

The procedural situation existing is somewhat complex. There are about 31 pleadings and procedural documents involved in the judgment roll. It is neither practical nor advisable to attempt to outline in detail the various issues presented by all of the pleadings and procedural steps taken. But because of the unusual situation presented in this action, it is necessary by summary outline to generally set out the essential issues presented by the pleadings and the procedure taken, as well as to generally state the basic facts to get at the controlling legal issues.

Originally the plaintiffs, Ray Wellens, also known as Ray N. Wellens, and Olga Wellens, his wife, after having taken possession of the property covered by the mortgage on June 9, 1952, commenced foreclosure thereof by advertisement. A notice of foreclosure dated August 11, 1952, appeared in the Fargo Forum on August 12, 1952. Thereupon, Oscar Oakland, one of the defendants and the last purchaser of the property listed in the notice, applied to the district court of Cass County to enjoin the mortgagees, Ray and Olga Wellens, from foreclosure of the mortgage by advertisement. This procedure was available to him under Sections 28-2908 and 35-2302, NDRC 1943. The last section mentioned was amended by Chapter 88 of the 1955

Session Laws. Mr. Oakland's application is dated August 21, 1952. It is supported by an affidavit signed by him in which he sets up alleged misrepresentations by Ray Wellens on which he says he relied; that he had invested all of his worldly possessions in the business; that the mortgagees are attempting to liquidate and force him out of business; that there are also questions arising as to the validity of the mortgage. He sets out other contentions which are not material here.

Although we have diligently searched the judgment roll, we do not find any order enjoining the foreclosure by advertisement. The trial court's memorandum states that foreclosure by advertisement was enjoined. The plaintiffs commenced the foreclosure of their alleged mortgage by an action in the district court of Cass County, North Dakota, on August 29, 1952.

On September 29, 1952, Oscar Oakland served an answer in this action. In this answer he denies the allegations of the plaintiffs, but admits that he did promise and agree to become jointly and severally liable with one Clarence Beck for various and sundry merchandise, furniture and fixtures constituting the assets of the business operated by Clarence Beck and the answering defendant, as a partnership under the name of "Wellens Auto Supply." He further admits that he assumed the balance due on the promissory note and chattel mortgage of Ray and Olga Wellens, dated July 11, 1950, originally the obligation of Al Georgeson and Clarence Beck. Then he sets forth that the plaintiffs in June 1952 took possession of the premises wherein the Wellens Auto Supply was located with all of the furniture, fixtures, books, accounts, inventory, mail and personal property of the defendants, and immediately barred the defendant Oakland from the premises and refused him entrance and his demand for inventory, the company mail and the use of the name Wellens Auto Supply, and even his personal effects. (These he obtained later.) The defendant asserts that the plaintiffs from that time operated the business without accounting to him for the inventory, property or assets of the business, although he demanded the same from them, and that they have continued to use the firm name of Wellens Auto Supply. Then he asserts that because of the representations of Ray Wellens in October of 1951, he transferred to Ray Wellens a farm consisting of 160 acres in Towner County, North Dakota, of the agreed value of $3,850 and alleges by way of counterclaim that he is entitled to a reconveyance of his farm or its value and damages of $15,000. From here on the procedural situation becomes involved.

Martha Dennis, on May 24, 1950, loaned $5,000 to purchase the property involved in this foreclosure action. There is a dispute in the evidence as to whether she loaned this money at the instigation and request of Ray Wellens or Al Georgeson and Clarence Beck. She petitioned for leave to intervene in the action. In fact, there are two petitions and two orders authorizing Martha Dennis to intervene in the action. One is upon her claim involving the balance of the loan of $5,000 and other advances made by her during the time that Al Georgeson and Clarence Beck and Oscar Oakland were in possession of the business, and the other for wages for services performed by her during the possession of the business by Al Georgeson and Clarence Beck.

In her complaint in intervention she sets out that she advanced $5,000 on May 24, 1950, to Al Georgeson and Clarence Beck, on which there was paid $1,350, leaving a balance of $3,650; that she made further advances to Beck during the time he was operating the business alone, and renewals of that indebtedness by Beck and Oakland, and prays for judgment for the balance claimed due in the sum of $4,750, and asks that her claim be adjudged a first and prior lien on the property of which the plaintiffs took possession in June 1952. She asks for a sale of the property for the satisfaction of her claim. Ray ond Olga Wellens an-

swered this complaint in intervention asserting the priority and superiority of their alleged mortgage.

In her other complaint in intervention, Martha Dennis denies the allegations of the plaintiffs' complaint and alleges that between May 24, 1950 and February 13, 1952, or for a period of 88 weeks, she performed services as bookkeeper and clerk for the defendants for which they promised to pay her $50 per week. She requests judgment for $4,400 at 4 per cent interest from February 13, 1952. Then as a defense to the action she sets forth that the chattel mortgage of Ray and Olga Wellens is fraudulent and void as to her, as intervenor, for the reason that the chattel mortgage did not provide for sufficient supervision of the business of the defendants; that the plaintiffs have neglected and failed to supervise the business of the defendants or required the defendants to account for net proceeds of the sale of the merchandise and other items described in said chattel mortgage; that the said Ray and Olga Wellens have permitted the defendants to buy and sell merchandise on credit, and otherwise conduct the business of the Wellens Auto Supply without regard to the chattel mortgage. She prays that the mortgage be found fraudulent and void as to her and for judgment upon her claim.

We do not find that Ray and Olga Wellens answered the complaint in intervention involving Miss Dennis's wage claim.

One M. C. Emery was permitted to intervene in this action. In his complaint in intervention he denies the allegations of the complaint of Ray and Olga Wellens and also the allegations of the complaint in intervention of Martha Dennis. While he does not designate which complaint of Martha Dennis in intervention he is answering, the record indicates that it is her complaint in intervention wherein she seeks judgment for the loan and advances made by her to Georgeson and Beck. Mr. Emery in his complaint in intervention pleads that he signed a note with Mr. Oakland to the First National Bank in Moorhead, Minne-

sota, which Oakland was unable to pay, and which the plaintiff, M. C. Emery was required to pay; that the balance due thereon amounted to $796.46. As his second cause of action he sets forth that on or about the 15th day of October 1951, he loaned to Oscar Oakland and Clarence Beck the sum of $968. Of this sum $293 was paid, leaving a balance of $675. Mr. Emery also asserts that the foreclosure action of the plaintiffs Ray and Olga Wellens is fraudulent and void as to him for the reasons said chattel mortgage does not provide for sufficient supervision of the business of said defendants, Oscar Oakland and Clarence Beck, by the plaintiffs; that the said Ray Wellens and Olga Wellens have failed and neglected to supervise the business of said defendants and to require the said defendants to account for and to pay over to the said Ray Wellens and Olga Wellens, the moneys received from the sale of the merchandise and other items described in said chattel mortgage; that said Ray Wellens and Olga Wellens have permitted the defendants to buy and sell merchandise on credit and otherwise conduct the business of said Wellens Auto Supply without regard to said chattel mortgage. The record does not disclose that the plaintiffs filed an answer to Emery's complaint in intervention.

Clarence Beck answered by general denial the complaint in intervention of Martha Dennis setting forth her claim for wages and the claim of M. C. Emery for the balance due on the note which he had to pay on behalf of Oakland and the balance due him on the amount of his loan to Beck and Oakland.

Oscar Oakland answered the complaint in intervention of Martha Dennis wherein she sought recovery for wages amounting to $4,400. Then he alleges that:

"the said defendants, Ray Wellens and Olga Wellens, by force and threat took from this answering defendant the business known as Wellens Auto Supply and converted the same to their own

use and have continued said business at all times since June, 1952 for their own use and benefit \* \* \*."

By reason of these facts he alleges that Ray and Olga Wellens are indebted to and responsible for the debts created by the business.

The record does not disclose any answer by Oscar Oakland to the complaint in intervention of Martha Dennis in which she seeks to recover the moneys that she advanced for Georgeson and Beck.

After notice of trial and note of issue had been served in this action, but before the trial of the action, and without any leave of court, the defendant, Oscar Oakland, amended his original answer in the foreclosure action. This amended answer was not served upon the parties or the plaintiffs' attorneys. But it is in the file and a part of the judgment roll. No objection was made before or at the trial to the amended answer. The evidence presented indicates that the action was tried, at least in part, on the basis of the allegations of the original foreclosure complaint and the defenses alleged and set forth in the amended answer of Oscar Oakland. The first objection to the amended answer was made on this appeal. Under these circumstances we deem the amended answer is properly before us. In that answer, Oakland, after denying the allegations of the complaint, admits that he did promise and agree:

"to become jointly and severally liable with one Clarence Beck upon various and sundry merchandise, furniture and fixtures, constituting the assets of the business operated by Clarence Beck and this defendant as a copartnership under the name of Wellens Auto Supply.",

amounting to $39,285.80, but alleges that this was a new transaction; that he never signed the alleged note and mortgage subject to this foreclosure and that the same was fully settled and discharged by the giving of a subsequent mortgage by this defendant and Clarence Beck covering the same indebtedness, and that by reason of said note and mortgage, the note and mortgage involved in the foreclosure action had been fully satisfied and discharged. Then he alleges as a separate defense the same allegations that were contained in the original answer with reference to the plaintiffs' taking possession of the property in 1952 and barring the defendant from the premises and the business, and that they have refused to account for the inventory, property and assets of the business, although a demand had been made, and have continued the business under the name of Wellens Auto Supply. Then he further alleges that the plaintiffs took possession of the property against his will and consent; that they have failed to render any accounting of the sales, although several demands have been made upon them and that in spite of an order of the court in the foreclosure proceedings, dated July 9, 1953, ordering and directing the plaintiffs to make a complete accounting, they have not done so. Then he alleges that the plaintiffs:

"took forcible possession of said business during the month of June, 1952. That by reason of said acts on the part of said plaintiffs, they have converted the said business to their own use and benefit, and that said business has become completely lost to this answering defendant, Oscar Oakland, to his damage in the sum of Fifteen thousand dollars ($15,000.00)."

Then he reasserts the same counterclaims contained in his original answer.

By his various pleadings, the defendant, Oscar Oakland, sets forth facts in his original answer in the foreclosure action, in his answer to the complaint in intervention of Martha Dennis seeking wages for $4,400, and in his amended answer, which squarely raises the question of whether or not the plaintiffs have converted the property described in the chattel mortgage, and thus lost their lien thereby.

For a further understanding of the somewhat confusing situation, we will set forth the basic facts out of which this litigation resulted. Ray Wellens and Olga Wellens owned a business at 417 NP Avenue, Fargo, North Dakota, operated by them under the firm name and style of Wellens Auto Supply. Their business consisted of the sale, both retail and wholesale, of new, used and rebuilt auto parts, armatures, generators, starters, fuel pumps and almost any other wearing parts of an automobile or a tractor.

On or about the 24th day of May 1950, they sold this business to Al Georgeson and Clarence Beck, for the sum of $52,500. Georgeson and Beck procured a loan from Martha Dennis of $5,000, which together with $2,000 they raised, constituted the down payment on the purchase of the business. There is some dispute as to whether the loan was made to them or Wellens, but the Dennis check was made out to them and marked, "Loan on merchandise in stock at Wellens Store." Georgeson and Beck endorsed this check to Wellens. About six weeks later, on July 11, 1950, Georgeson and Beck, under the name of Wellens Auto Supply, made, executed and delivered to Ray and Olga Wellens a note and mortgage for $45,500 at 4% interest, representing the unpaid balance of the purchase price. Georgeson and Beck mortgaged not only the inventory of the property existing at the time, but also "all additions hereinafter made and the proceeds of the same", as well as the fixtures. They were permitted to sell the merchandise in the ordinary course of trade without accounting for the net proceeds of such sales. Under the mortgage they were required to pay $300 each month commencing July 16, 1950, on the indebtedness secured by the mortgage and $150 rent of the building. The mortgage contained a power of sale. It also contained a provision that the mortgagors:

"shall not reduce the value of the stock or merchandise to an extent more than twenty percent (20%) below the inventory value placed thereon by the inventory which has been completed by the parties until at least fifty percent (50%) of the debt has been paid and thereafter the mortgagors shall not reduce the value of the stock or merchandise below sixty percent (60%) of its original inventory value until the debt is paid off in full."

The mortgage also contained a proviso that:

"and the undersigned mortgagors agree to keep a detailed and accurate account of sales and new goods purchased and upon demand of the mortgagee they shall and will render to the mortgagee an accurate account of such sales and purchases * * *."

The plaintiffs never demanded such accounting.

Beck and Georgeson operated the Wellens Auto Supply until sometime in December 1950, when Georgeson withdrew from the business. Thereafter Beck operated the business alone with such supervision as Ray Wellens may have given. Ray Wellens had a room or office in the building and a key to the building. He was in and about the business all of the time from the date of sale except for a vacation trip to California. It was during the time he was in California that Georgeson withdrew from the business.

In October or not later than November, 1951, Oakland became a partner of Clarence Beck by purchasing an interest in the property. Oakland insists that Ray Wellens was the moving party in the sale of an interest in the business to him. But it was Beck who accepted him as a partner. In order to acquire an interest in the business, Oscar Oakland conveyed to Ray Wellens a quarter section of land in Towner County, valued at $3,850. Oakland asserts that Ray Wellens made representations to him that were false and on which he relied. Beck and Oakland remained partners from November 1951, until the

latter part of February 1952. Then Beck withdrew from the partnership and sold his interest therein to Oscar Oakland. The buy and sell agreement between Oscar Oakland and Clarence Beck is dated February 23, 1952. Oscar Oakland conveyed a small farm subject to a mortgage at Walker, Minnesota, to Beck for his interest in the Wellens Auto Supply. He agreed to assume the indebtedness to Martha Dennis, "if her figures are correct on the books", at $4,925. Oakland was to receive all accounts receivable between May 24, 1950, and February 23, 1952. The agreement states:

"I, Mr. Oakland, will accept inventory as is."

The agreement indicates that no inventory had been taken at the time. Oakland then agreed to employ Clarence Beck as a salesman or in any other capacity for an indefinite period of time. Beck was to furnish a list of accounts receivable. This preliminary agreement of purchase and sale was followed by a dissolution agreement between the parties dated February 25, 1952, which carried out the terms of the preliminary agreement, and in addition thereto set forth the indebtedness of the partnership which Oscar Oakland agreed to assume. This covered some 21 accounts. Among the accounts listed is the balance due on the note and chattel mortgage of Ray and Olga Wellens as of February 16, 1952, in the sum of $39,353.33; also the balance due Martha Dennis in the sum of $4900, and the amount due Factory Sales, Minneapolis, Minnesota, in the sum of $130. Then there are several other accounts listed. Moog Industries, Inc., is not listed among the claims assumed by Mr. Oakland. Except for this list of debts under the agreement Oscar Oakland was not to be held responsible for any other liabilities or unperformed contracts of Clarence Beck incurred by him prior to the formation of the partnership. The first party, Beck, agreed to indemnify and save the party of the second part from all such debts, liabilities and contracts. There-

after and on the 28th day of February 1952, Oscar Oakland entered into an agreement with Ray and Olga Wellens, by which he agreed that a mortgage given by him and Beck to Ray and Olga Wellens dated December 21, 1951, and securing the balance of the indebtedness secured by the mortgage of July 11, 1950:

"will be disregarded and of no force and effect and that in lieu thereof, the said chattel mortgage dated July 11, 1950, and the indebtedness secured thereby will remain in full force and effect and that said mortgage, together with all of its obligations and the debt secured thereby are assumed by the said Oscar Oakland."

In turn, Ray and Olga Wellens, agreed at the request of Oscar Oakland, to satisfy the mortgage dated December 21, 1951, and stipulated that the satisfaction thereof:

"will not operate to accomplish a payment of the indebtedness owing."

The agreement further provided that the balance due on the indebtedness:

"after crediting the sum of Three Thousand Eight Hundred Fifty and no/100 Dollars ($3,850.00), for the land conveyed to the said Wellens by the said Oakland and after crediting all other payments made, is the sum of Thirty-nine Thousand Three Hundred Fifty-three and 33/100 Dollars ($39,-353.33) as of February 16, 1952."

The trial court did not permit the plaintiffs to foreclose their chattel mortgage. It restrained the foreclosure thereof pending the sale to satisfy claims of the intervening creditors, Martha Dennis and others, which will later be mentioned.

In order to further attempt to clarify the situation, we will summarize the findings and conclusions reached by the trial court and comment thereon.

The court found that prior to May 24, 1950, Ray and Olga Wellens were engaged in the wholesale and retail auto parts busi-

ness, including the rebuilding and sale of electric motors, at 417 NP Avenue, Fargo, North Dakota, under the firm name and style of the Wellens Auto Supply; that they sold said business to Clarence Beck at the agreed price of $52,500, of which $7,000 was paid, and the balance of $45,500 was secured by a chattel mortgage upon the furniture, fixtures, equipment and inventory of said business and the addition and replacements and proceeds of sales. We believe the facts warrant the conclusion that the sale was made to both Georgeson and Beck. It further found that the mortgagor, Clarence Beck, was permitted to sell the stock of the business for cash or on credit and was not required to render any accounting of the business to the mortgagees, or to turn over any of the receipts from sales "other than the monthly payments." (The monthly payment provided for $300). It may be here noted, as we have already shown, that the mortgagees had the privilege of requesting an accounting from the mortgagors to ascertain the inventory value of the property. This they never did.

The trial court further found that Martha Dennis advanced $5,000 in the form of a loan, upon the agreement and representation of Ray Wellens that the repayment thereof would be a prior claim to the chattel mortgage, and that there remains unpaid on her original loan of $5,-000 the sum of $3,650. While her right of priority is not set out in the findings, her claim of priority is based on Exhibit "D", signed by Wellens, Georgeson and Beck, and states:

"This is to certify that Martha Dennis may take out the $50.00 per week (Saturdays) even though Ray & Olga Wellens's monthly payment is not made.

"Dated this 24 day of May, 1950.

/S/ "Ray W. Wellens

/S/ "'Al' A. B. Georgeson
"A.B.G.

/S/ "Clarence Beck"

The court also found that on July 11, 1950, Al B. Georgeson became associated with Clarence Beck in the business and that the partnership was dissolved on December 11, 1950. This finding is at variance with the facts. The original check of Martha Dennis in the sum of $5,000 was made payable both to Al Georgeson and Clarence Beck and endorsed by them to Ray Wellens, indicating that they became associated as partners on May 24, 1950. It is true that on July 11, 1950, they both signed a note and a chattel mortgage for the unpaid purchase price of the business amounting to the sum heretofore mentioned. The court also found that in November 1951, Oscar Oakland purchased a partnership interest in the Wellens Auto Supply with Clarence Beck; that Oscar Oakland, in payment of the interest purchased in the Wellens Auto Supply conveyed to Ray and Olga Wellens a farm consisting of 160 acres, described as the SW¼ 27–164–66, Towner County, North Dakota, and valued at $3850; that said transaction was consummated upon the reliance by Oscar Oakland of representations of Ray Wellens:

"that no indebtedness existed against said business except the unpaid purchase price; that there were many substantial customers; that a large gross business was done; that government contracts were available; and that Wellens Auto Supply was a successful business making large sums of money; that said representations were false and known by Ray Wellens to be false and made with the purpose of inducing Oscar Oakland to purchase said business interest."

The court also found that during the ownership of said business by Oscar Oakland, Clarence Beck and Al Georgeson, personal loans were obtained from M. C. Emery on which there remains unpaid $1,-471.40; that Moog Industries extended credit to the Wellens Auto Supply in various sums, of which $456.97 is unpaid; that Factory Sales Company extended

credit to the Wellens Auto Supply of which there is $130 unpaid.

The court also found that Ray and Olga Wellens took possession of the business in June 1952, and that at that time the furniture, fixtures and equipment were worth $8,300, and the inventory of merchandise held for sale was $9,982.70; that at said time the business:

"was then being operated and possessed by Oscar Oakland as a sole trader;"

that since said time, Ray and Olga Wellens have operated the business:

"without accounting for said assets at any time, although ordered to do so by the Court."

The court did not find that Mr. Wellens took possession with the consent of Oakland. It found that the business was subject to a mortgage dated July 11, 1950, wherein Ray Wellens and Olga Wellens are mortgagees, and Clarence Beck and Al Georgeson are mortgagors on which there is due $39,920.86. It found that the business was subject to a chattel mortgage given by Clarence Beck and Oscar Oakland as mortgagors to Martha Dennis as mortgagee on which there remains unpaid $4,672.81. It will be remembered that the court had previously found that there remained unpaid $3,650 of the original $5,000 loaned by Martha Dennis at the time of the purchase of the business by Al Georgeson and Clarence Beck. The facts show that Martha Dennis renewed her indebtedness with Clarence Beck and later with Clarence Beck and Oscar Oakland and these renewals included the balance due of the original loan. The findings made by the court do not take into account that the $4,672.81 found to be due her upon the mortgage that she had taken from Clarence Beck and Oscar Oakland, includes the balance of the original loan of $5,000 or the sum of $3,650.

Based on the findings the trial court concluded as a matter of law that Oscar Oakland was induced by fraud to convey the 160 acres of land valued at $3,850, and that he was:

"entitled to the return of said farm or the sum of $3,850.00 with legal interest thereon from and since the 29th day of August 1952, for which sum Oscar Oakland is entitled to Judgment against Ray Wellens and Olga Wellens with interest at the legal rate from November 1, 1950."

There is an obvious error in this conclusion. Oscar Oakland did not buy into the Wellens Auto Supply until in October or November 1951. The record does not disclose the date of the conveyance by Oscar Oakland. By the 29th of August 1952, this litigation had been commenced.

The court further concluded that Oscar Oakland, Clarence Beck and Al Georgeson had obtained loans from M. C. Emery on which there remained unpaid the sum of $1,471.40, and which sum is a personal obligation of all three. It may be noted here that M. C. Emery dealt only with Oscar Oakland. He never advanced any money to either Clarence Beck or Al Georgeson. But he did advance money to Oscar Oakland operating as the Wellens Auto Supply and the evidence seems to be undisputed that there remained unpaid of said loans and advances the sum mentioned in this conclusion of the court. The evidence shows the money was used in the Wellens Auto Supply business.

The court concluded that Martha Dennis made a loan of $5,000 to the Wellens Auto Supply upon the representations of Wellens that the said sum would be repaid before the indebtedness secured to the plaintiffs by chattel mortgage upon the business of the Wellens Auto Supply, and that thereafter Martha Dennis received various payments on said loan, of which there remains unpaid $3,650, which sum:

"is prior and superior to any claim of the plaintiffs".

The trial court also concluded as a matter of law that the chattel mortgage of the plaintiffs:

"is voidable as to creditors and is void and of no force and effect as a superior or prior claim against the claims of Oscar Oakland and Martha Dennis. * * *",

and that it is void and of no force and effect as against the claim of Moog Industries, Inc., in the sum of $456.97 and the claim of Factory Sales Company, in the sum of $130; and that these:

"two claims are prior and superior to any rights or claims of the plaintiffs."

It grants judgment to Martha Dennis for $3,650 with interest from January 1, 1951, Factory Sales for $130 with interest from November 1, 1950, and Moog Industries for $456.97 with interest from November 1, 1950. The court did not grant judgment to M. C. Emery.

The court also concluded that Ray and Olga Wellens took possession of the business in June 1952 and:

"have since operated said business *as their personal business* and have bought, sold and co-mingled said assets with their own and without accounting for said assets or the income therefrom to the parties and interveners herein or to the court as required by the order of the court dated July 9, 1953, and that by reason thereof the plaintiffs Ray Wellens and Olga Wellens are mortgagees in possession and accountable for said furniture, fixtures, equipment and inventory to the parties and interveners in this action." (Emphasis supplied).

It further concluded that when Ray and Olga Wellens took possession in June 1952, the furniture, fixtures and equipment were valued at $8,300 and the inventory amounted to $9,982.70. Then the court concluded that judgment be entered for the cost and

expenses of the sale in favor of Oscar Oakland, Martha Dennis, Factory Sales Company and Moog Industries, Inc., and that they:

"have valid and subsisting liens upon the furniture, fixtures, equipment and inventory of which Ray Wellens and Olga Wellens took possession in June, 1952, and that said liens are prior, superior and paramount to the interests, liens and encumbrances of plaintiffs Ray Wellens and Olga Wellens, and each of them * * *"

and that they are entitled to a foreclosure of said liens by a sale to be conducted by the sheriff of Cass County or his deputies and authorize him or his deputies to seize possession of the furniture, fixtures, equipment and inventory, or so much thereof as may be found for the purpose of safely keeping the same and preparing it for sale and making an inventory thereof; and that by such sale the plaintiffs, Ray and Olga Wellens, and each of them, and all persons claiming any interest in said property, through or under the plaintiffs subsequent to the commencement of this action are barred from any claim or right, except the right to redeem:

"that the proceeds of such sale shall be applied by the sheriff, first, in payment of the costs and expenses of sale including the cost of any agent appointed to assist him as heretofore provided; second, in the payment of the costs and disbursements of this action; third, in the payment of the amount herein found to be due and owing each of said parties, Oscar Oakland, Martha Dennis, Factory Sales Company and Moog Industries, Incorporated, and so much thereof as the proceeds of such sale applicable thereto will satisfy; that the surplus of said proceeds, if any, remaining after the payments aforesaid, shall be brought into court to abide its further order."

Then it concluded that if any deficiency remains upon the amount herein found to

be due to the parties mentioned they shall have execution thereof against the plaintiffs, Ray and Olga Wellens. None of these parties except Martha Dennis had any lien or liens. Martha Dennis was not attempting to enforce her lien. If Martha Dennis had priority over plaintiffs' alleged mortgage it was on the basis of Exhibit D.

Judgment was entered on the basis of these findings and conclusions. The evidence shows that Martha Dennis took two mortgages, one from Clarence Beck and one from Beck and Oakland, to secure the balance due of her original loan to the purchasers Georgeson and Beck and advances made to Beck. These mortgages, however, were taken with full knowledge of the mortgage of July 11, 1950, which was on file in Cass County. Her only claim to priority was based on Exhibit D. For her wages she claims as other creditors of Wellens Auto Supply. Miss Dennis did not seek to foreclose either mortgage. Oakland's claim is based on fraud. The other two, Moog Industries, Inc., and Factory Sales, were unsecured creditors of the Wellens Auto Supply. Neither one of their claims had been established at the time of the trial of this action. They had not intervened in the action, nor at the time of the trial did they assert any liability as against the plaintiffs. In fact, they had brought actions in the Cass County court against Al Georgeson, Clarence Beck and Oscar Oakland, individually and as copartners doing business as the Wellens Auto Supply, and in their actions they had garnisheed Ray and Olga Wellens. Their actions are not before us. They have not been tried.

On the basis of this determination by the trial court, the plaintiffs have appealed to this court and demanded a trial de novo. The appellants specify errors based on the findings and the conclusions of the trial court. Since this is a trial de novo in the supreme court, we will determine the facts and the law applicable without specific reference to the specifications of errors cited by the appellants.

We have heretofore set forth the essential facts. The record is voluminous. It involves a multitude of procedural matters, extending over several years before the case came to trial. The trial court indicates that the plaintiffs have been represented by six firms of attorneys. It is evident that the transactions between the parties were loosely and carelessly conducted. Considerable portions of the evidence presented are irrelevant to the basic issues involved. It is both unnecessary and impractical to set forth the facts in all their details. However, we will discuss all applicable facts with reference to the issues that we deem decisive here.

■ We believe the first question for our determination is whether or not the plaintiffs by taking possession of the property as mortgagees June 9, 1952, without legal process, and exercising complete dominion and ownership over the property, wrongfully converted property of Oscar Oakland and extinguished their lien under the terms of Section 35-0120, NDRC 1943.

The evidence is in dispute as to whether Ray Wellens obtained voluntary possession of the business from Oscar Oakland. Ray Wellens testified that on June 9, 1952, he took possession of the Wellens Auto Supply. He had been in and about the business most of the time from the date of its sale to Georgeson and Beck. He had access to the building. He had a key thereto. He had the use of a room or office therein. He testified that Oscar Oakland brought the key up to his apartment and delivered it to him in the presence of Mrs. Wellens. He was asked:

"Q. You had keys, didn't you? A. Yes. But the agreement was he was supposed to bring me that key. He horsed around about a week trying to throw that key away." * * *

"Q. You took possession about June 9, 1952? A. Take out the word 'about' and say June the 9th, period.

"Q. All right. It was June 9, 1952. You took possession of everything, did you not? A. June the 10th I went down and opened up.

"Q. That isn't what I asked you. I asked you 'you took possession of everything at that time.' A. What was I supposed to do. I just walked back in there.

"Q. What is that? A. I just walked back in there. I had his key.

"Q. I understand you did that. But you took possession of all of the merchandise, machinery and fixtures. A. What do you mean by 'taking possession?' I didn't put it all in my pockets and coat. I just left it lay on the shelf where it was."

There is no question that Ray Wellens took possession of the business and has operated it as his own since June 1952. His only claim of lawful possession is based upon his statement that Oscar Oakland delivered a key to the building, which Wellens did not need to take possession of it, as he had a key himself. It is to be noted that Mrs. Wellens was not called to corroborate the statement as to the delivery of the key by Oscar Oakland on June 9, 1952. The evidence that Oscar Oakland, "horsed around about a week trying to throw that key away" is significant. Wellens took possession without legal process, without obtaining any document showing a conveyance of title from Oscar Oakland. Upon taking possession of the business, without legal process or any attempt at process to gain legal possession, he began to exercise, on June 10, 1952, complete dominion over the business, and since that time has continued to exercise all the rights and incidents of an owner thereto. He admits that he did not get possession of the accounts receivable immediately, nor the mail. The mortgage covered the accounts receivable.

Oscar Oakland testified to the possession obtained by Wellens. He agrees as to the date when Wellens took possession. He denies that he voluntarily left the Wellens Auto Supply. He was asked:

"Q. Did you do so voluntarily? A. I did not. There was nothing else for me to do. Mr. Wellens seized the books, takes over the business, and there wasn't anything else I could do."

After the mortgage foreclosure was started, Wellens applied to the court for an ex parte order to obtain possession of the mail, freight and express, and the use of the firm name. The mail was an important incident of the business. Any freight or express constituting additions or replacements was covered by the mortgage. If full credence is to be given to Wellen's testimony that Oscar Oakland voluntarily surrendered the business to him, it is strange that he had to resort to court action to obtain the mail, freight, and express, and the right to use the firm name of Wellens Auto Supply. The fact that he had to resort to this method of getting possession of the mail, the right to use the firm name and to receive the express and the freight of the firm, is strong corroboration of Oakland's testimony that he did not surrender or voluntarily give up the business. Oakland's actions after the commencement of the foreclosure are consistent with his testimony. His testimony bears out the content of his answer. From the testimony of Martha Dennis it is evident that Wellens was attempting to get possession of the books and records. Martha Dennis gave up possession of the books and records on or just prior to February 13, 1952. It is also apparent from the evidence that sometime between that date and June 9, 1952, Ray Wellens obtained possession of the books and deprived Oakland of access to them.

The evidence of Mr. Wellens throughout the trial appears, even on the face of the cold record, evasive and lacks that quality of candor which should exist. He

seemed most reluctant to answer questions directly.

When all of the circumstances of the evidence are considered, we conclude as an ultimate fact that Ray Wellens took possession of the Wellens Auto Supply on June 9, 1952, without the consent of, and against the will of Oscar Oakland. We further conclude that he excluded Oscar Oakland from the business, took possession of the records, without which it was impossible for Oscar Oakland to operate the business, and that he has since operated said business without regard to the rights of Oscar Oakland therein. He commenced the operation of the business as though he owned it immediately upon taking possession, to the entire exclusion and consideration of the rightful owner thereof, Oscar Oakland.

■ Title to mortgaged chattels remains in the mortgagor until divested by a foreclosure. Sanford v. Bell, 2 N.D. 6, 48 N.W. 434; Peterson v. Wolff, 68 N.D. 354, 280 N.W. 187.

Assuming without deciding that there was a default in the payments required under the mortgage and that it was valid as between the parties, the mortgagee had the right of possession to the mortgaged chattel property after default, but only for the purpose of foreclosure to satisfy the amount of the mortgage indebtedness. Latta v. Wright, 67 S.D. 531, 295 N.W. 490.

■■ The lien of a mortgage is special, unless otherwise expressly agreed, and is independent of possession. Section 35–0202, NDRC 1943. A mortgage does not entitle the mortgagee to the possession of the property, but after execution of a mortgage, the mortgagor may agree to the change of possession without a new consideration. Section 35–0213, NDRC 1943. As we view the evidence no agreement was reached as to change of possession by Mr. Wellens and Mr. Oakland prior to or since the time Mr. Wellens took pos-

session. Mere surrender of a key, which the mortgagee did not need to gain possession, if such key was surrendered, is not sufficient. Wellens exercised immediate dominion over the property with all the incidents of an owner for over two months before he attempted to foreclose the mortgage by advertisement. Thereupon Mr. Oakland immediately took the steps provided by statute to force the foreclosure thereof by action on the basis that he had a valid defense thereto, and which he asserted in the pleadings as summarized herein.

■■ Section 35–0120, NDRC 1943 provides that wrongful conversion by a person holding a lien on personal property extinguishes the lien on the property converted. Thus it appears that if the plaintiffs wrongfully converted the property on which they have a chattel mortgage, their mortgage was extinguished by such conversion and they cannot foreclose. Peterson v. Wolff, 68 N.D. 354, 280 N.W. 187.

"Where the mortgagee is in possession, the exercise by him of any dominion over the property, inconsistent with the rights of the mortgagor or with the relation which he justly sustains to the property, will constitute a conversion in case the mortgagor elects so to treat it;" 14 C.J.S. Chattel Mortgages § 215, By Mortgagee, p. 817; Peterson v. Wolff, supra.

The type of business operated by Wellens Auto Supply would result in the sale of any part or portion of the mortgaged stock if the occasion demanded depending upon the requirements of the public. Thus the mortgagees in possession were disposing of the property in denial of the title or interest of the mortgagor without having acquired such right by legal process. Nor had the mortgagees done anything to obtain possession in law before resorting to the property and disposing of it. There can be no question that the mortgagees were exercising wrongful dominion over the property that was wholly inconsistent

with the rights of the owner and without his acquiescence for two months before they took any steps whatsoever to divest his title.

"The lien of a chattel mortgage is extinguished where the mortgagee wrongfully converts the mortgaged property." 10 Am.Jur., Chattel Mortgages, Section 221, page 860; Strehlow v. McLeod, 17 N.D. 457, 117 N.W. 525, 17 Ann.Cas. 423; Steidl v. Aitken, 30 N.D. 281, 152 N.W. 276, L.R.A. 1915E, 192.

Viewing the entire record we determine that the plaintiffs wrongfully converted the property of Oscar Oakland and thereby extinguished their lien thereon. They have no mortgage to foreclose. The defendant, Oscar Oakland, who had assumed the debts secured by the mortgage, had at no time waived foreclosure of the mortgage. Schreiner v. Shanahan, 105 Neb. 525, 181 N.W. 536.

The appellants sold their business to Georgeson and Beck on May 24, 1950. However, Ray Wellens kept close contact with the business. He had access to the building in which it was housed, stayed in the building off and on, had a room there, and to a greater or less extent supervised the business except for a time when he was absent on a trip to California. He never completely severed his connections with the Wellens Auto Supply and the evidence indicates that although he had sold the business, he felt that he had, at least to some extent, a proprietary interest therein. This may have contributed to his belief that when he took over on June 9, 1952, he had the right to exercise dominion and ownership over the property before depriving Oakland of his title to the business.

■■ Both in the original answer and in the amended answer, Oakland pleaded fraud perpetrated upon him by Ray Wellens when he purchased an interest in the Wellens Auto Supply. The trial court found that by reason of the fraud of Ray

and Olga Wellens, Oscar Oakland was entitled to a return of his farm or the sum of $3,850. The judgment ordered payment of $3,850 together with interest of $850 and costs of $17.35, making a total judgment of $4,718.40, or in lieu thereof Oscar Oakland was entitled to a return or reconveyance of the SW¼ of Section 27–164–66, Towner County, North Dakota. He was allowed no recovery on his alleged counterclaim for $15,000. No evidence was presented to substantiate that part of the counterclaim.

Assuming that the representations made by Mr. Wellens when Oscar Oakland purchased an interest in the Wellens Auto Supply in November 1951 constituted fraud, is Oakland entitled to the judgment granted to him? He and Beck were in complete possession of the business from November 1951 to the last part of February 1952. It is reasonable to assume that in about three months time Oscar Oakland did discover that the representations made by Wellens, at least to a considerable extent, were not true. The dissolution agreement of February 25, 1952, between Beck and Oakland, discloses that the business was heavily in debt beyond the balance due to the Wellenses. At that time, if not before, Oakland knew that any representation made by Wellens that the business owed only the unpaid balance of the purchase price was not true. The dissolution agreement sets out some twenty items of indebtedness that Oakland assumed and agreed to pay. It is impossible to escape the conclusion that a business so heavily indebted was not prospering or possessed of substantial customers. Furthermore, it is reasonable to assume that in the course of three months Oakland could and did discover that the volume of the business was not as great as had been represented, and he must have ascertained that it was not as successful a business as he had been led to believe. Oakland's assumption of the debts disclosed to him that it was not making large sums of money. In spite of the knowledge that he had gained concerning

the nature of the business during a period of three months, he entered into an agreement with Mr. Wellens on February 28, 1952. In that agreement he not only agreed to assume the balance of the indebtedness represented by the July 11, 1950 mortgage, but he agreed to receive and did receive credit for the value of the farm conveyed to Wellens by him in the sum of $3,850. It is well settled that acts done in the affirmance of a contract can amount to a waiver of fraud, where they are done with full knowledge of the fraud and of all the material facts and with the intention clearly manifested of abiding by the contract and waiving the right to recover for the deception. Warne v. Finseth, 50 N.D. 347, 195 N.W. 573; 37 C.J.S. Fraud § 69, Waiver of Right of Action, p. 363. See also 24 Am. Jur., Section 209, Fraud and Deceit, page 34.

In the case of Conzelmann v. Northwest Poultry & Dairy Prod. Co., 190 Or. 332, 225 P.2d 757, 766, it is stated:

"It is well established by the authorities that when one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all right to damages on account of such fraud. If he receives some substantial concession from the one guilty of such fraud, he waives his right to insist further upon holding the wrongdoer responsible in damages for the fraud. Anderson v. Laws, 176 Or. 468, 159 P.2d 201; Phillips v. Malone, 223 Ala. 381, 136 So. 793; Burne v. Lee, 156 Cal. 221, 104 P. 438; Bonded Adjustment Co. v. Anderson, 186 Wash. 226, 57 P.2d 1046, 106 A.L.R. 166."

This rule is applicable here. The defendant Oakland, at the time he entered into the dissolution agreement knew that there were a large number of creditors aside from the unpaid portion of the purchase price of the Wellens Auto Supply business, and he knew that the business was not prosperous. Yet in face of that knowledge he dealt with Wellens and entered into a written agreement with him on February 28th assuming the balance of the mortgage after receiving credit on the indebtedness to the extent of the value of the farm that he had conveyed to Wellens. Thus he waived and relinquished his right to damages on account of the fraud or the right to a reconveyance of the land.

We will now determine whether or not the mortgage of the plaintiffs dated July 11, 1950, is valid as to creditors of the mortgagors, or their successor Mr. Oakland, who assumed and agreed to pay the mortgage indebtedness.

The mortgage in question is very similar to the chattel mortgage involved in the case of Madson v. Rutten, 16 N.D. 281, 113 N.W. 872, 13 L.R.A.,N.S., 554. The mortgagors were permitted to retain possession of the property and to sell and dispose of the stock. There was no limitation as to whether they could sell for cash or credit. They were not required to account to the mortgagee for the net proceeds of the sales. They were required only to pay a stipulated monthly sum to apply on the mortgage indebtedness. While the mortgagee had the right to ask for an accounting, that was never done. Is such a mortgage valid as to creditors?

The most generally accepted rule is that where it appears on the face of the chattel mortgage or by parole evidence that the mortgagee has given the mortgagor power to dispose of the property mortgaged, and apply the proceeds to his own use, or to such use as he sees fit the mortgage is void as to creditors and subsequent purchasers in good faith without reference to the bona fides of the mortgage debt, or the honesty of the intention of the parties. See Annotation, 73 A.L.R. 236 involving validity of chattel mortgages where mortgagor is given right to sell. This annota-

tion cites cases from the United States Court, the courts of a majority of the states of the Union as well as Alaska. The above rule applies where a part of the proceeds of the sale of the property is used for payment of the mortgage debt. In Blakeslee v. Rossman, 43 Wis. 116, it was held: .

> "A chattel mortgage permitting the mortgagor to remain in possession, and to sell, and apply the proceeds, or any part of them, to his own use, is fraudulent and void in law as against creditors."

For other cases along the same lines, see 73 A.L.R. 279. In Madson v. Rutten, supra, this court followed the rule laid down in Blakeslee v. Rossman, supra, and stated [16 N.D. 281, 113 N.W. 875]:

> "By a stipulation in the mortgage, the latter was permitted to remain in possession and to make sales in the ordinary course of business, at retail, but no provision was contained therein requiring the net proceeds of such sales to be applied upon the mortgaged indebtedness. It permitted the mortgagor to conduct the business in every respect the same as if such mortgage was not in existence. He was permitted to sell for cash or on credit, at his option, and was not required to render accounts of the business to the mortgagee, nor, what is still more fatal, was he required to turn over any portion of the receipts from sales other than the monthly payments of $25 aforesaid to be applied upon the mortgage debt. Therefore, the inevitable result of this mortgage was to hinder and delay the mortgagor's general creditors. That the same was fraudulent in law and therefore voidable as to creditors we entertain no doubt."

See also Bergman v. Jones, 10 N.D. 520, 88 N.W. 284, 88 Am.St.Rep. 739; Clark v. Huckaby, 8 Cir., 28 F.2d 154, 67 A.L.R. 1456, writ of certiorari denied in 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 561.

The mortgage involved in the case at bar falls squarely within the rule of Blakeslee v. Rossman, supra, relied upon in Madson v. Rutten, supra. It was fraudulent and void in law as against the creditors of the mortgagors and Oakland, who had assumed the mortgage debt.

The evidence warrants the finding of the trial court with reference to the amount due Martha Dennis upon the original loan that she made to Mr. Georgeson and Mr. Beck, and the advances that she thereafter made to Mr. Beck, in the sum of $4,672.81. That sum, however, includes the $3,650 which the trial court held was a prior claim upon the property to that of the mortgage the plaintiffs are attempting to foreclose.

■ We do not find that Ray and Olga Wellens interposed any answer to the complaint in intervention of Martha Dennis claiming wages due for her services to the Wellens Auto Supply for a period of 88 weeks at $50 per week or $4,400. They were defendants in that action. The evidence fully establishes that Martha Dennis performed services for the Wellens Auto Supply reasonably worth $50 per week for 88 weeks. The only dispute is as to whether she performed these services for Al Georgeson and Clarence Beck, or for Ray Wellens, Al Georgeson and Clarence Beck. But that becomes immaterial in view of the fact that the mortgage is fraudulent and void as to creditors. Martha Dennis is a creditor of the mortgagors. She is entitled to $4,400 on her wage claim.

■ It has been noted that the trial court did not grant intervenor, M. C. Emery, any judgment. The evidence clearly establishes that Emery signed a note with Mr. Oakland which he had to pay and made other advances to him to enable him to operate the business of Wellens Auto Supply. He is also a creditor of the mortgagors. He is entitled to the amount found by the trial court to be due him.

Factory Sales, Inc., and Moog Industries, Inc., did not intervene in this action. They

did not present any proof or evidence to show the amount of their claims. The dissolution agreement between Beck and Oakland lists Factory Sales as a creditor in the amount of $130. The record shows that each of these parties, as plaintiff, brought a separate action against Al Georgeson, Clarence Beck and Oscar Oakland individually and as copartners doing business as the Wellens Auto Supply in the county court of increased jurisdiction, Cass County, North Dakota. In each of these actions they garnisheed Ray and Olga Wellens. These actions have not been tried. They are still pending in the county court. In both actions, Ray and Olga Wellens, garnishees, made a disclosure denying liability. There was, however, no basis for adjudication of their claims in this action.

Based on the findings we have reached in this action, the status of the parties and the property is as follows:

1. The plaintiffs converted Oakland's property and extinguished their lien. They cannot foreclose their mortgage.

2. Oakland is still the owner of the property in the hands of Ray and Olga Wellens.

3. The mortgage which Oakland assumed and agreed to pay was fraudulent and void in law as against creditors of the mortgagors or Mr. Oakland.

4. Oakland's title to the property is subject to the rights of creditors of the mortgagors or their successor, Mr. Oakland, without priority.

5. If any fraud was involved when Oakland bought an interest in the property from Ray and Olga Wellens in October or November 1951, he waived the same after knowledge thereof by subsequent dealings and agreement with Ray Wellens.

6. The mortgages taken by Martha Dennis as security for indebtedness due her are also fraudulent and void in law as against creditors.

7. Ray and Olga Wellens, Martha Dennis, E. C. Emery are creditors of the mortgagors, or Mr. Oakland, who assumed and agreed to pay the mortgage obligation. They have established their claims in this action.

8. Although Factory Sales, Inc., and Moog Industries, Inc., have not as yet established that they are creditors of the mortgagors or Mr. Oakland, who assumed and agreed to pay the mortgage obligation, they may be able to establish their claims.

The judgment is reversed and in light of these findings we remand this action for a new trial, with leave of the parties to amend their pleadings, and without prejudice to those who are or may become parties to this action by intervention to apply for a receivership herein.

GRIMSON, C. J., and MORRIS, BURKE and SATHRE, JJ., concur.